IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 9, 2022

**YASIN SOLOMON HAWKINS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2015-C-2127      Mark J. Fishburn, Judge**
_____

**No. M2021-00536-CCA-R3-PC**
_____

The Petitioner, Yasin Solomon Hawkins, appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief, arguing that he received ineffective assistance of counsel and that his waiver of the right to a jury trial was not knowing, intelligent, and voluntary.  After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

David L. Hudson, Jr., Nashville, Tennessee, for the Appellant, Yasin Solomon Hawkins.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and, Janice Norman, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

In 2015, the Petitioner was indicted for one count of aggravated robbery and one count of aggravated assault.  Following the appointment of counsel, the Petitioner filed a motion to suppress the identifications made during a photographic lineup and a motion to suppress his confession, which were both denied.  The Petitioner then waived his right to a jury trial by signing a written waiver, pursuant to Tennessee Rule of Criminal Procedure 23, and proceeded to a bench trial.  The proof at this bench trial showed that the Petitioner pointed a gun at Radhika Patel, an assistant manager at a hotel on Old Hickory Boulevard in Davidson County, and demanded the money in the hotel's cash drawer and that Patel gave him all of the money inside.  State v. Yasin Solomon Hawkins, No. M2017-02439-CCA-R3-CD, 2018 WL 4520949, at *3 (Tenn. Crim. App. Sept. 20, 2018), perm. app. denied (Tenn. Jan. 16, 2019).  The Petitioner also pointed his gun at Atul Kumar, the

manager of the hotel, before exiting the hotel with the cash and driving away. Id. Officer Bryan Murphy testified that he responded to a call about a suspicious person at an apartment complex and encountered the Petitioner, who had recognizable tattoos and was wearing a distinctive Hawaiian shirt, asleep in a breezeway of the complex. Id. The Petitioner provided his name to the officer, and when the apartment complex elected not to prosecute him for trespass, the Petitioner left. Id. Officer Murphy learned later that day that an individual, who was wearing clothing matching what the Petitioner had been wearing, had committed a hotel robbery. Id. After watching the surveillance footage related to this robbery, Officer Murphy confirmed that the perpetrator in the footage was the Petitioner. Id. Detective Sam Tetterton testified that he later interviewed the Petitioner, who confessed to robbing the hotel at issue as well as two other hotels. Id. at *1, *3. Both the surveillance video of the robbery and the recording of the Petitioner's confession were admitted into evidence. At the conclusion of the bench trial, the trial court found the Petitioner guilty beyond a reasonable doubt of the aggravated robbery charge but acquitted the Petitioner of the aggravated assault charge. Id. The trial court later sentenced the Petitioner as a career offender to thirty years at one hundred percent in the Tennessee Department of Correction. Id.

On direct appeal, the Petitioner presented only one issue, whether the trial court erred in denying his motion to suppress his statement to police. Id. at *3-4. This court, concluding that the trial court had properly denied the motion to suppress, affirmed the judgment of the trial court, and the Tennessee Supreme Court denied permission to appeal. Id. at *4.

The Petitioner then filed a petition for writ of error coram nobis, alleging that his arrests warrants were newly discovered evidence and that they were improperly executed and forged, and this court affirmed the trial court's summary dismissal of this petition. Yasin Solomon Hawkins v. State, No. M2018-02155-CCA-R3-ECN, 2019 WL 2774308, at *3-4 (Tenn. Crim. App. July 2, 2019), perm. app. denied (Tenn. Jan. 15, 2020).

Thereafter, the Petitioner timely filed a pro se petition for post-conviction relief, alleging, among other things, that he received ineffective assistance of counsel. Following the appointment of post-conviction counsel, the Petitioner filed an amended petition, arguing in pertinent part, that counsel provided ineffective assistance in failing to explain the ramifications of waiving his right to a jury trial, in failing to investigate and prepare a defense, in failing to prepare for the bench trial, and in failing to consult with the Petitioner during the appeals process. The Petitioner additionally asserted that the cumulative effect of counsel's errors deprived him of the effective assistance of counsel.

At the post-conviction hearing, the Petitioner testified that when he asked counsel if he thought a bench trial was a good idea, counsel replied, "[N]obody kn[ew] the law

better than the Judge." The Petitioner asserted that counsel never explained his constitutionally protected right to a jury trial, the potential advantages of a jury trial, the benefit of being judged by a jury of one's peers, the requirement that jurors reach a unanimous verdict, or the importance of a jury trial in cases involving cross-racial identification. He said counsel also never explained a hung jury and never disclosed that counsel had received hung juries in previous cases. The Petitioner claimed that if counsel had explained these things to him, he would not have waived his right to a jury trial. He stated that his decision to have a bench trial was not the product of a free and deliberate choice and that he had waived his right to a jury trial without adequate information.

The Petitioner also maintained that counsel failed to prepare him for the bench trial. He said that counsel never explained anything to him concerning the bench trial and that counsel's only strategy was to hope that the two witnesses for the State failed to appear at his trial.

The Petitioner additionally claimed that counsel never explained the appellate process to him and never discussed any potential grounds for his appeal. He said that counsel never communicated with him during the appellate process and that he was forced to write to the appeals court in order to obtain a copy of his brief. As a result, he felt like he had no attorney during the appellate process.

The Petitioner stated that counsel encouraged him to accept the State's plea offer, but when he refused this offer, counsel stopped communicating with him. He asserted that he was not actively informed about the defense of his case.

The Petitioner acknowledged that there was a surveillance video of the aggravated robbery for which he was charged. He also admitted that an officer was able to identify him as the person with the gun who robbed the hotel on this video and that the two witnesses to the crime also identified him as the perpetrator. He said the officer believed he was the perpetrator because he was wearing the same Hawaiian shirt that the perpetrator wore on the surveillance video.

The Petitioner said that counsel was "a good dude" who "just made a bad decision" by encouraging him to have a bench trial when he was a career criminal. He said counsel conveyed the State's plea offer to him but then told him that the State's witnesses were not going to appear at trial because these witnesses had already failed to appear for the preliminary hearing and pre-trial motions. The Petitioner claimed that he "kept turning down the [State's] offer" because counsel assured him that the witnesses would not show up at trial, and if these witnesses failed to testify against him, there was a good possibility that his charges would be dismissed. He said counsel never told him he had a right to twelve jurors who would not be advised about his criminal history so long as he chose not

to testify. Although the Petitioner insisted he was not guilty of the aggravated robbery offense, he said that if he had it to do over again, he would have accepted the State's offer of fifteen years rather than "get[ting] slammed with thirty years." When asked if he understood that a grant of relief would result in a new trial rather than a fifteen-year offer, the Petitioner replied that he knew that his relief would be a new trial "with twelve jurors." When the Petitioner was asked what would happen if the twelve jurors watched the surveillance video from the aggravated robbery and determined that the perpetrator in the video looked exactly like him, the Petitioner stated, "I can live with it because I had a right to twelve jurors. I'd rather have twelve jurors convict me than a Judge who knows everything about me."

The Petitioner admitted that he had confessed to the police but claimed that he did not understand what he was doing at the time because he was under the influence of both cocaine and alcohol, which he told the officers at the time of his interview. The Petitioner said that when the motion to suppress his confession and the motion to suppress the identifications were denied, counsel told him that he would receive a sentence of thirty years if convicted at trial. He said that when he signed the waiver of his right to a jury trial, he understood only that the trial judge would determine his guilt or innocence at a bench trial.

The Petitioner claimed that he never read the waiver of a jury trial before he signed it and that neither counsel nor the trial court explained the rights he was abandoning by signing the waiver. He said he signed the waiver because counsel had advised him to do so. In response to questioning from the court, the Petitioner said that counsel began representing him six months before his bench trial, that counsel met with him four times prior to his trial, and that counsel never discussed the advantages and disadvantages of a jury trial and bench trial. He claimed that he did not understand he had a right to a jury trial and that when he signed the waiver, "it stripped him of everything" because he "signed over his life."

Counsel testified that he had practiced law since 2012 and that his practice was almost entirely comprised of criminal cases. He stated that he had represented clients charged with minor criminal offenses up to first degree murder and that he had taken many of these cases to trial. He stressed that although he and the Petitioner got along well, the evidence against the Petitioner was overwhelming. Counsel noted that the officer who encountered the Petitioner became aware of the robbery and realized that the Petitioner was wearing the same distinctive Hawaiian shirt that the perpetrator had worn in the surveillance video of the robbery of the hotel, which immediately made the Petitioner a suspect. He said that two eyewitnesses also identified the Petitioner as the perpetrator.

- 4 -

Counsel knew that the Petitioner's identification as the perpetrator was the most damaging issue, which was why he filed a motion to suppress the witnesses' identifications based on a procedural error the officer made when presenting the lineup to these witnesses. He noted that the only address the State had for these witnesses was the hotel's address, and he asked his investigator to see whether the State would be able to locate these witnesses. In preparation for the suppression hearing regarding the identifications, counsel also sent a subpoena to the hotel. Although the witnesses failed to appear at the suppression hearing, the trial court nevertheless denied the motion to suppress. Counsel stated that following the denial of this motion, he visited the Petitioner in jail eleven times, not including the times he talked with the Petitioner at his hearing dates.

Counsel said he presented the State's offer of fifteen years to the Petitioner. He described this offer as "soft," meaning that he thought he could convince the prosecutor to agree to a slightly shorter sentence, perhaps around twelve years, although the Petitioner would have to serve any agreed upon sentence at one hundred percent. Counsel stated that the Petitioner was not interested in entering a guilty plea for a sentence to serve because the Petitioner had already served substantial time on an unrelated conviction and was convinced that the witnesses would not appear at his trial. He noted that the Petitioner had lined up a job at a car detailing business, and he asked the State about the possibility of a Community Corrections sentence for the Petitioner. Counsel said the State had great leverage in this case because it had the Petitioner, who had an extensive criminal record, on the surveillance video committing the aggravated robbery. He stated that the Petitioner was a career offender whose criminal history included prior convictions for second degree murder, especially aggravated robbery, attempted second degree murder, and four counts of aggravated assault. Consequently, the State was not interested in allowing the Petitioner to receive a Community Corrections sentence.

Counsel stated that he wrote a letter to the Petitioner, stating that he had received a fifteen-year offer at one hundred percent from the State and that he believed the Petitioner should accept it. This letter, which was admitted into evidence, referenced the trial court's denial of the motion to suppress the eyewitnesses' identifications of the Petitioner. In this letter, counsel predicted what would happen if the Petitioner rejected the State's offer and proceeded to a jury trial, stating:

[H]ere's how the trial will go:

They will play that [surveillance] video for the jurors, both hotel workers will describe what happened, they will say there was a gun, they will say it was you, they will say you took money.

There's not a whole lot I can bring up to convince a jury that it either wasn't you or that they weren't in fear or that money wasn't taken or that they didn't think it was a gun.

We have to be real with ourselves. I've had over 20 trials in just the past 4 years. The ones that are on video all end the same. You know these past 6 months I've been all on board with everything we can think of to help. You know I come out to see you, I've tried some motions, tried the expungement, called the hotel to see if [the hotel's assistant manager] R[adhika Patel] still exists. . . . I'm going to be as real with you as I possibly can. We cannot win this case at trial.

. . .

I'll ride or die with whatever you decide and I'll throw everything at them if we have to have a trial. . . . As someone who cares about you I am going to tell you to accept this 15. It would be wrong of me to lie to you and pump you up, tell just the things you want to hear . . . then go out there and see you get . . . 30+ [years]. It's hard for me to tell you point blank to take 15 years but it'll be even harder for me to sit there at a sentencing hearing when the Judge gives you so much time that you don't ever get out.

Make the choice that guarantees that you get out someday.

Counsel stated that when he visited the Petitioner to discuss the State's fifteen-year offer, the Petitioner told him that the hotel had been demolished, and they discussed issues regarding subpoenaing the witnesses. Counsel said, "[The Petitioner] just had it in his mind [that] the hotel is gone, [the State's witnesses] are not going to know to come to court." Counsel confirmed that the hotel had been demolished, and the Petitioner refused to accept the State's offer because he was convinced that the witnesses were not going appear in court to testify against him.

Counsel said one witness, Atul Kumar, testified at the preliminary hearing, but the other witness, Radhika Patel, did not testify at that hearing. He noted that the Petitioner's case was set for a jury trial in late February 2017 and that the proof against the Petitioner was substantial. Consequently, counsel had his investigator try to find the State's witnesses to see if they would actually appear at trial. He agreed with the Petitioner's assertion that the defense had a "heavy reliance" on witness unavailability. Counsel readily acknowledged that charges are not automatically dismissed simply because a witness fails to appear in court; however, he said he may not have fully explained this issue to the Petitioner. He stated that "[i]f somebody has died, that would make a difference" and that

"if somebody is local and just doesn't want to cooperate with their subpoena, that may also make a difference [in a defendant's case]." Counsel said that he encouraged the Petitioner to accept the State's offer, although he and the Petitioner did discuss the possibility of "witnesses not coming." Counsel acknowledged that there were some indications that "maybe [the witnesses] wouldn't be available or maybe they wouldn't make themselves . . . present in court." He asserted that Atul Kumar ultimately did not appear at trial to testify against the Petitioner.

Counsel said that from September 2016 to January 2017, he prepared for trial. His investigator confirmed that Radhika Patel was living in another state, which boded well for the Petitioner. The investigator also discovered that although Atul Kumar had just had shoulder surgery and did not want to testify, it was clear the State would be able to find Kumar. When counsel told the Petitioner that the State was in contact with Atul Kumar, the Petitioner was not happy.

Counsel said that the State later sought a continuance of the Petitioner's jury trial based on Kumar's surgery. Although the Petitioner's confession to law enforcement had initially been misplaced, the State found the Petitioner's confession just before the State requested a continuance. Because the State was in contact with Kumar and had found the Petitioner's confession, counsel did not oppose the State's request for a continuance. Counsel said that when he discovered that witness Radhika Patel was living in North Carolina, he informed the Petitioner that the State might have some trouble getting Patel to testify given that she was out of state. Counsel explained that at the time of the Petitioner's trial, he had successfully gotten charges dismissed in one or two other cases in Davidson County. He noted that "if witnesses are not present, a bench trial seems to be an easier mechanism for getting your case dismissed than a jury trial."

Counsel stated that he talked to the Petitioner about a jury trial because the Petitioner nearly had a jury trial in February 2017. He said that he routinely talked to his clients about what a jury trial is, where to sit in the courtroom, voir dire, the calling of witnesses for both sides, and the right not to testify. Counsel said that he met with the Petitioner in jail on February 1, 2017, and February 10, 2017, and that he "might have" talked to the Petitioner about those details related to jury trials because those two meetings were approximately two to three weeks prior to the Petitioner's jury trial date.

He said that after the Petitioner's jury trial was continued, he received the copy of the Petitioner's confession, wherein the Petitioner stated that he was "high" on cocaine and then gave "a little too much detail about this robbery." He noted that although he filed a motion to suppress the Petitioner's confession, this motion was denied. Counsel recalled that on the date the court denied the motion to suppress the Petitioner's confession, the Petitioner requested a bench trial.

When asked what led the Petitioner to waive his jury trial and have a bench trial, counsel said that the Petitioner continued to believe that the witnesses would not appear at trial, even though counsel told him that he expected the witnesses to testify, and the Petitioner knew that a bench trial was a better mechanism for getting charges dismissed. Counsel said that "you always have to assume that [witnesses] are not coming," although he recognized that this "doesn't happen as much in . . . criminal court trials as it does in General Sessions." However, counsel asserted, "I never would have relied on [the Petitioner] saying somebody is not coming." He added, "I would have prepared for [the State's witnesses] to come, and did[.]" Counsel said that two or three days prior to the bench trial, he received notice that Radhika Patel might be coming to trial. He informed the Petitioner of the likelihood of Patel's presence the day before the bench trial, although the Petitioner continued to insist that Patel would not show up for trial. Counsel said he wanted the Petitioner to be prepared for Patel to testify against him, and he talked to the Petitioner about his defense strategy if Patel or Kumar appeared at trial.

When counsel saw Patel the first day of the bench trial, he informed the Petitioner of Patel's presence and then suggested asking the State about a potential plea agreement or requesting a continuance, but the Petitioner refused both of these options. Counsel said that during the trial, the Petitioner repeatedly told him that the State had hired an actress to play Patel. He said there was never a time during the case where the Petitioner would have agreed to enter a guilty plea for a sentence to serve.

Counsel acknowledged that his conversations with the Petitioner were "less frequent" after the Petitioner's conviction because following a conviction the record "controls everything." He said he had "a policy" that if there is a disagreement regarding issues for appeal, he decides the issues because these are legal issues that most defendants do not understand. He said he routinely sends the appellate brief to his clients, but he did not specifically remember sending one to the Petitioner in this case. He agreed that he did not video conference or visit the Petitioner during the appellate process and said that at most "it would have been a few letters." Counsel acknowledged that it was during the appeal that his relationship with the Petitioner went sour, although he believed this was because the Petitioner realized he would be spending the next thirty years of his life in prison, not because there was any issue with his representation of the Petitioner.

Counsel acknowledged that there was a "heavy connection" between the decision to have a bench trial and witness unavailability. He also said that the Petitioner had wanted to have his trial fast, and a bench trial was a "quicker way to have your day in court." He admitted that the idea for a bench trial initially came from counsel because the Petitioner would not have been familiar with that strategy. Counsel noted that someone outside the jail had informed the Petitioner that the hotel had been demolished, which had been proven to be true. Because the Petitioner was so certain that the witnesses would not appear at

trial, counsel suggested a bench trial because it would "not only be faster, but maybe more likely to be dismissed . . . if [the witnesses] don't come."

Counsel said he did not present any witnesses in the Petitioner's defense at trial but asserted that the Petitioner's case was not a "witness-heavy case." He stated, looking back, there was no one he wished he would have talked to in order to prepare for the Petitioner's trial. Counsel asserted that he pursued a theory of misidentification at trial, in light of the less than clear surveillance video depicting the perpetrator. Counsel said that the only thing he would have done differently was more forcefully argue for the Petitioner to to accept an offer from the State, if such an offer was possible, once Radhika Patel appeared to testify at trial.

Following this hearing, the post-conviction court entered an order denying post-conviction relief. Regarding the claim that counsel failed to inform the Petitioner of the consequences of waiving his right to a jury trial, the post-conviction made the following conclusions:

Petitioner signed a written waiver as per Rule 23 [of the Tennessee Rules of Criminal Procedure]. The testimony from both Petitioner and trial counsel was that the decision to waive the right to a jury trial was a strategic decision made in hopes of a dismissal if the witnesses did not show for the trial. The reasoning offered at the hearing for this strategic move was that trial counsel had pursued it successfully in the past. Although the court questions the justification for the waiver, it is highly unlikely that the strategy affected the ultimate outcome.

The evidence of the Petitioner's guilt was overwhelming. There was the identification of Petitioner by the officer who had encountered him earlier in the day, the video of the robbery on surveillance video, two eyewitnesses who identified Petitioner as the perpetrator, and Petitioner's own statement given to the police in which he confesses to this and other crimes. The Petitioner has failed to submit any evidence that he was prejudiced by the decision to waive a trial by jury, nor has there been any evidence that the results would have been different had they submitted this case to a jury. Indeed, Petitioner's own testimony shows that he believes a jury trial would not have turned out differently as he testified that . . . if he "could do it all over again," he would have taken the State's offer of 15 years to serve.

Regarding the claim that counsel failed to investigate and properly prepare for the bench trial, the post-conviction court held:

Petitioner asserts that trial counsel's entire strategy rested upon asking for a non-jury trial in the hopes that the witnesses would not appear. He claims that trial counsel abdicated his constitutional duty to afford petitioner the effective assistance of counsel when this so-called strategy failed. The record and the evidence contradict this assertion.

As soon as trial counsel was appointed, he filed a motion to suppress the photographic line-up in which Petitioner was identified by two witnesses. He dispatched an investigator to try to locate these same witnesses to ascertain if they were going to be available at trial. Trial counsel also filed a motion to suppress Petitioner's statement to the police as soon as the statement came to light. Trial counsel met with Petitioner numerous times, and he explained the evidence against him, his exposure, and they frankly discussed the fact that a dismissal due to witness unavailability would be Petitioner's best chance, if not his only chance, in this case. Trial counsel's letter to Petitioner reflects trial counsel had a comprehensive knowledge of the strengths and weaknesses of the case, the extent of the evidence inculpating Petitioner, the likely outcome based on this evidence, and his awareness of the risk of Petitioner going to trial versus accepting the plea offer. As noted by trial counsel[,] "I'll ride or die with whatever you decide and I'll throw everything at them if we have to have a trial." This is not an abdication of his constitutional duties to his client, but a reaffirmation of the[m] despite his pretrial strategy failing to achieve the desired results. This letter was sent only after trial counsel's primary defense strategy failed to achieve the desired results. This is not an abdication of his constitutional duties to the Petitioner, but a reaffirmation of his commitment to them despite pretrial setbacks. The Petitioner has failed to show that trial counsel's defense strategy fell below the level of competence required of attorneys in criminal cases.

Lastly, as to the claim that counsel failed to adequately communicate with the Petitioner regarding the appeal, the post-conviction made the following conclusions:

At the hearing, trial counsel testified that he did not generally consult with defendants in depth regarding issues for appeal as he felt these issues were legal in nature, not factual. Although it is always the better policy to communicate all efforts expended on behalf of a criminal client even if for informational purposes only, Petitioner offered no evidence as to what issues

trial counsel failed to raise in his appeal, and he has not demonstrated how he was prejudiced by trial counsel not consulting with him regarding these issues.

Following entry of this order, the Petitioner timely filed a notice of appeal.

## ANALYSIS

The Petitioner argues that he received ineffective assistance of counsel. Specifically, he claims that counsel provided ineffective assistance in failing to explain the advantages of a jury trial, in failing to adequately prepare for trial, and in failing to communicate with him during the appellate process. The Petitioner also argues that the cumulative effect of all of counsel's errors deprived him of effective assistance of counsel. The State responds that the post-conviction court properly denied the Petitioner relief. We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Id. § 40-30-110(f); see Tenn. Sup. Ct. R. 28, § 8(D)(1); Nesbit v. State, 452 S.W.3d 779, 786 (Tenn. 2014). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

A claim for post-conviction relief based on alleged ineffective assistance of counsel presents mixed questions of law and fact. Mobley v. State, 397 S.W.3d 70, 80 (Tenn. 2013) (citing Calvert v. State, 342 S.W.3d 477, 485 (Tenn. 2011)). A post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Calvert, 342 S.W.3d at 485 (citing Grindstaff, 297 S.W.3d at 216; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). "Accordingly, we generally defer to a post-conviction court's findings with respect to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." Mobley, 397 S.W.3d at 80 (citing Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999)). However, we review a post-conviction court's application of the law to its factual findings de novo without a presumption of correctness. Id. (citing Grindstaff, 297 S.W.3d at 216; Finch v. State, 226 S.W.3d 307, 315 (Tenn. 2007); Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006)).

The right to effective assistance of counsel is protected by both the United States Constitution and the Tennessee Constitution. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) this deficient performance prejudiced the defense. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Strickland v. Washington, 466 U.S. 668, 687 (1984). A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Id.

In assessing an attorney's performance, we "must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462 (citing Strickland, 466 U.S. at 689). In addition, we must avoid the "distorting effects of hindsight" and must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 689-90. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Id. at 688-89. However, "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

First, the Petitioner contends that counsel provided ineffective assistance in failing to explain the importance of a jury trial. Although he admits he signed the waiver form so he could proceed to a bench trial, he claims counsel "did not explain the advantages of trial by jury" and "simply urged [the Petitioner] to waive his rights so he could pursue the bizarre strategy of hoping that the alleged victims in the case would not show up to court." The Petitioner asserts that counsel never informed him that he had a constitutional right to a jury trial, that a jury is required to find a defendant guilty by a unanimous vote, that a key part of a jury trial is selecting a jury, or that counsel had previously represented defendants in criminal cases in which there was a hung jury. He also asserts that counsel's error in recommending a bench trial was "compounded by the fact that the right to a jury trial

- 12 -

becomes even more important and essential in a case that involves cross-racial identification (or misidentification)."

At the post-conviction hearing, the Petitioner testified that counsel never explained the potential advantages of a jury trial and that if counsel had done so, he would not have waived his right to a jury trial. The Petitioner claimed that his decision to have a bench trial was not the product of a free and deliberate choice and that he waived his right to a jury without adequate information. The Petitioner insisted that he "kept turning down the [State's] offer" because counsel assured him that the witnesses would not show up at trial, and that if the witnesses failed to show and testify against him, there was a good possibility that his charges would be dismissed. On the other hand, counsel testified that he talked to the Petitioner about a jury trial because the Petitioner nearly had a jury trial in February 2017. Counsel said that he routinely talks to his clients about what a jury trial is, where to sit in the courtroom, voir dire, the calling of witnesses for both sides, and the right not to testify. Counsel explained that the two witnesses in this case had failed to testify at the preliminary hearing and pre-trial hearings and that one witness was recovering from surgery and the other witness had moved to North Carolina, which made it more likely that these witnesses would not appear at the Petitioner's trial. Counsel said he suggested a bench trial because it would "not only be faster, but maybe more likely to be dismissed . . . if [the witnesses] don't come." He claimed that the Petitioner refused to accept the State's offer and waive his right to a jury trial because the Petitioner was convinced that the witnesses were not going to appear in court to testify against him, even though counsel strongly urged him to accept the State's offer and told him that he expected the witnesses to testify against him.

The post-conviction court recognized that the Petitioner had signed a written waiver of his right to a jury trial and that the testimony from both Petitioner and trial counsel showed that "the decision to waive the right to a jury trial was a strategic decision made in hopes of a dismissal if the witnesses did not show for the trial." Although the post-conviction court "question[ed] the justification for the waiver," it held that it was "highly unlikely that the strategy affected the ultimate outcome" in light of the overwhelming evidence of the Petitioner's guilt, which included the officer's identification of the Petitioner, the surveillance video of the robbery, the eyewitnesses' identifications of the Petitioner as the perpetrator, and the Petitioner's confession during his interview with police. The post-conviction court held that the Petitioner had failed to present any evidence that he was prejudiced by the decision to waive a trial by jury or that the results would have been different had his case been submitted to a jury. In addition, the court recognized that the Petitioner essentially admitted a jury trial would not have resulted in a different outcome for him because the Petitioner testified that if he "could do it all over again," he would have taken the State's offer of 15 years, not that he would have chosen a jury trial over a bench trial. The record fully supports the post-conviction court's conclusion that

- 13 -

the Petitioner failed to show he was prejudiced by counsel's performance on this issue, particularly given the overwhelming evidence of the Petitioner's guilt. Because the Petitioner has failed to show that counsel provided ineffective assistance on this issue, he is not entitled to relief.

Alternatively, the Petitioner appears to argue, as a stand-alone claim, that his waiver of the right to a jury trial was not intelligent, knowing, and voluntary. We recognize that this particular issue, which is separate from the related ineffective assistance of counsel issue addressed above, was never included in the Petitioner's original or amended petition for post-conviction relief and was never decided by the post-conviction court. Accordingly, this issue is waived, and this court is precluded from considering this issue. Holland v. State, 610 S.W.3d 450, 458 (Tenn. 2020) ("Tennessee appellate courts may only consider issues that were not formally raised in the post-conviction petition if the issue was argued at the post-conviction hearing and decided by the post-conviction court without objection." (emphasis added)); Walsh v. State, 166 S.W.3d 641, 645 (Tenn. 2005) ("Issues not addressed in the post-conviction court will generally not be addressed on appeal."); Cauthern v. State, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004) ("[A]n issue raised for the first time on appeal is waived.").

Second, the Petitioner argues that counsel provided ineffective assistance in failing to adequately prepare for the bench trial. He claims that counsel's strategy was based on a mere hope that the State's witnesses would fail to appear at trial and that counsel made "little to no preparation" for trial aside from this misguided strategy. The Petitioner acknowledges that counsel filed two suppression motions and encouraged him to accept a plea deal; however, he asserts that the "breakdown of the adversarial process" occurred when counsel failed to prepare for the bench trial itself.

At the post-conviction hearing, the Petitioner testified that counsel failed to prepare him for the bench trial and never informed him of the defense of his case. He claimed that counsel's entire defense strategy was limited to the expectation that the State's witnesses would not appear at trial. However, counsel testified that he strongly encouraged the Petitioner to settle his case in light of the overwhelming nature of the evidence against him, and he detailed his grim predictions of what would happen if the Petitioner proceeded to trial, as shown by counsel's letter to the Petitioner that was admitted at the post-conviction hearing. Although he acknowledged that there was a "heavy connection" between the decision to have a bench trial and witness unavailability, counsel said that once it became clear that Patel would be testifying at trial, he suggested trying to get a plea offer from the State or asking for a continuance, but the Petitioner refused both of these options. Counsel asserted that while he had hoped that the two witnesses would not testify at trial and had investigated whether the State would be able to locate these witnesses, he did not rely on the witnesses' absence from trial and prepared for trial as if both witnesses would testify.

- 14 -

Counsel also said he pursued a theory of misidentification at trial given the lack of clarity of the surveillance video.

In its order denying relief, the post-conviction court found that counsel "frankly discussed the fact that a dismissal due to witness unavailability would be Petitioner's best chance, if not his only chance, in this case." The court also found that counsel's letter to the Petitioner established that counsel "had a comprehensive knowledge of the strengths and weaknesses of the case, the extent of the evidence inculpating Petitioner, the likely outcome based on this evidence, and his awareness of the risk of Petitioner going to trial versus accepting the plea offer." The post-conviction court determined that this letter was not an "abdication of [counsel's] constitutional duties to his client, but a reaffirmation of the[m,] despite his pretrial strategy failing to achieve the desired results." The record fully supports the post-conviction court's findings, and we conclude that the Petitioner failed to show that counsel's preparation for trial or his defense strategy fell below the level of competence required of attorneys in criminal cases. Accordingly, the Petitioner is not entitled to relief on this issue.

Third, the Petitioner asserts that counsel provided ineffective assistance in failing to communicate with him during the appellate process. Specifically he claims that counsel "pursued the [direct] appeal without so much as speaking to [him]" and filed an appeal primarily focused on the unconstitutionality of the confession without consulting with him regarding other possible issues. He claims that counsel's failure to communicate "cannot be justified as some sort of strategic decision."

At the post-conviction hearing, the Petitioner testified that counsel failed to consult with him regarding his appeal. Counsel acknowledged that his conversations with the Petitioner were "less frequent" after the Petitioner's conviction because, following a conviction, the record "controls everything." He said he had "a policy" that if there is a disagreement regarding issues for appeal, he decides which issues to raise on appeal because these are legal issues that most defendants do not understand [66]. While counsel admitted that it was during the appeal that his relationship with the Petitioner went sour, he believed this was because the Petitioner realized he would be spending the next thirty years of his life in prison, not because of any issue regarding his representation of the Petitioner.

In its order denying relief, the post-conviction court noted that while it was a better policy for attorneys "to communicate all efforts expended on behalf of a criminal client even if for informational purposes only," the Petitioner had offered "no evidence as to what issues trial counsel failed to raise in his appeal" and had not shown "how he was prejudiced by trial counsel not consulting with him regarding these issues." We fully agree with the post-conviction court's holdings on this issue. We also conclude that the Petitioner has

failed to show that counsel's handling of the appeal was deficient in light of the substantial deference given to counsel in determining the issues on appeal. See Carpenter v. State, 126 S.W.3d 879, 887 (Tenn. 2004) ("The determination of which issues to raise on appeal is generally within appellate counsel's sound discretion."); King v. State, 989 S.W.2d 319, 334 (Tenn. 1999) ("Counsel is given considerable leeway to decide which issues will serve the appellant best on appeal, and we should not second guess those decisions here."). Because the Petitioner failed to establish that counsel provided ineffective assistance as to this issue, he is not entitled to relief.

Finally, the Petitioner argues that the cumulative effect of all of counsel's errors deprived him of the effective assistance of counsel. The cumulative error doctrine "is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). The Petitioner argues that "counsel's numerous and cumulative deficiencies amounted to a breakdown of the adversarial process" and that "there is a presumption of prejudice."

The cumulative error doctrine only applies when there has been more than one error committed during the trial proceedings. Id. at 77. Even if counsel were somehow deficient in failing to inform the Petitioner of the differences between a jury trial and a bench trial, which we feel the Petitioner failed to demonstrate at the post-conviction hearing, the Petitioner has certainly failed to establish that counsel committed more than one error in his case. Accordingly, we conclude that the Petitioner is not entitled to post-conviction relief under the cumulative error doctrine.

## CONCLUSION

Based on the aforementioned authorities and reasoning as well as the record as a whole, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. MCMULLEN, JUDGE